**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JACQUELINE PERDOMO O/B/O XM, A MINOR,** | |
| **Plaintiff,** | Civ. No. 17-5003 (KM) |
| **v.** | **OPINION** |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| **Defendant.** | |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff, Jacqueline Perdomo, seeks review pursuant to 42 U.S.C. § 405(g) of a final decision by the Commissioner of Social Security ("Commissioner") denying Social Security Income child's benefits (SSI) to her son, X.M.[1]

Some procedural background is useful. Administrative Law Judge Barbara Dunn ("ALJ Dunn") found that X.M. was not disabled and denied him benefits. The Appeals Council affirmed that denial, and in doing so declined to consider supplemental evidence consisting of X.M.'s 2015 Individual Education Plan ("IEP"). On appeal to this Court, I ordered a remand for consideration of that supplemental evidence, agreeing with the plaintiff that it was legal error to exclude X.M.'s 2015 IEP as irrelevant merely because it was produced after the end of the claimed period of disability. Such a document, I reasoned, might still contain historical information relevant to the assessment of X.M.'s status in the claimed period of disability (*i.e.,* through July 11, 2014). (DE 25) The Commissioner then moved for reconsideration, seeking a bright-line ruling. I again rejected its legal position that the IEP, because it post-dated the claimed

---

[1]   For ease of reference and to preserve confidentiality, I will refer to the minor plaintiff as "X.M."

period of disability, was necessarily irrelevant. But on reconsideration, as it had not done before, the Commissioner cited the assessments in the 2015 IEP one-by-one, and established that each was either

> (a) already contained in the 2013 IEP or other evidence that was before the ALJ and taken into account in the 2014 decision; or
>
> (b) concerned matters dating from November and December of 2015, and did not address X.M.'s functioning before July 11, 2014.

Persuaded that a remand would be fruitless, I granted reconsideration on those grounds. (DE 30–31)[2]

I noted that the Court's prior Order and Opinion, now reversed on reconsideration, had remanded for consideration of the 2015 IEP without reaching the Plaintiff's substantive grounds for appeal. In this Opinion, I now consider those arguments. For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

## I.   BACKGROUND

### Procedural History

X.M. filed for SSI benefits on April 30, 2012, alleging that he had been disabled since March 31, 2012. (R. 170–75.)[3] His alleged disabilities include

---

[2]     The timing issue perhaps took on particular significance for the following reason. Plaintiff filed a second SSI application on behalf of X.M. as of May 27, 2016. He was approved for Title XVI SSI disability benefits. (Pl. Br. at 5; DE 28 at 2.) The issue here, then, does not involve the SSA's current ongoing award of benefits, but a historical denial of benefits for an earlier claimed period of disability. Part of the SSA's objection appears to relate to the use of its subsequent award of benefits, and the records on which it was based, to leverage a reversal of the earlier denial. That, however, is neither here nor there for purposes of the current appeal.

[3]     Citations to the record are abbreviated as follows:

"DE _" = Docket entry in this case

"R. _" = Administrative Record (DE 8) (the cited page numbers correspond to the number found in the bottom right corner of the page for all DE 5 attachments)

"Pl. Br." = X.M.'s Brief (DE 18)

"Gov. Br." = Commissioner's Brief (DE 19)

Reply = X.M.'s Reply (DE 21.).

hyperactivity disorder, learning disabilities, cognitive impairments, social anxiety, high blood pressure, and asthma. (R. 355–59.)

X.M's claims were denied at the initial and reconsideration levels, (R. 88–90, 94–96), and he received a hearing before ALJ Barbara Dunn on July 11, 2014, after which the ALJ issued a decision finding plaintiff was not disabled and not entitled to SSI child's benefits. (R. 13–42.)

After a series of appeals and procedural disputes, plaintiff filed the operative complaint July 7, 2017, and the case was assigned to me on April 3, 2019. (DE 1, 25.) X.M.'s current appeal only challenges the determinations relating to his hyperactivity.

**Facts**

X.M. was born on July 19, 2006. A preschooler at the time of his application, he was 8 years old at the time of the ALJ hearing. (R. 24.) He was classified as a special education student and had received certain accommodations at school. The parties' primary remaining dispute in this case concerns the interpretation of a number of evaluations by doctors and certain personnel at X.M.'s school. I will review each of those evaluations below.

Dr. Gomez-Rivera

Dr. Gomez-Rivera, a psychiatrist and neurologist, was X.M.'s treating physician. (R. 361.) He evaluated X.M. on March 2, 2012, in response to complaints of hyperactivity, restlessness, and varying moods and attitudes. (R. 361–63.) Dr. Gomez-Rivera reported that X.M. appeared distracted, displayed irritable emotional reactions, and seemed anxious. (*Id.*) The doctor concluded that X.M.'s concentration was below normal limits, and reported that X.M.'s borderline intelligence may be due to problems with attention and concentration. (*Id.*) He diagnosed X.M. with attention deficit hyperactivity disorder ("ADHD") and prescribed Mellaril 25mg bid., Benadryl 50mg, and Concerta ER 18mg. (*Id.*) In an updated report on January 3, 2013, Dr. Gomez-Rivera stated without further explanation that X.M.'s mental condition had not improved, and that he was unable to function in school due to his hyperactivity, though the latter statement did not appear to be based on Dr.

3

Gomez-Rivera's personal observations. (R. 379.) Dr. Rivera-Gomez concluded that X.M.'s prognosis was "poor" and stated his intent to continue seeing X.M. for psychotherapy and pharmacotherapy sessions. (*Id.* at 380.)

Records maintained by Dr. Gomez-Rivera's office from October and November of 2013 and January of 2014 revealed that X.M. continued to exhibit hyperactivity, anxiety, and distracted concentration, (R. 404–09), though by January of 2014 Dr. Gomez-Rivera reported that X.M.'s concentration was average (R. 410). Those same evaluations found that X.M.'s appearance was appropriate, his communication was spontaneous, his reaction was average, his motor function was purposeful, he was fully oriented, and his memory was average. (Tr. 24, 404–09.)

### Dr. Okoh

Dr. Okoh was X.M.'s treating pediatrician. She noted that X.M. had a history of aggression and hyperactivity, for which he had been diagnosed with ADHD. (R. 369, 386.) She further noted in her patient history that X.M. had been hyperactive at school and home for months, and that his teachers complained that his performance had been affected and he had disrupted teaching activities very often. (R. 386.) She prescribed Ventolin and reported that X.M.'s ADHD medications may have been causing drowsiness. (R. 387.) She advised his parents to discuss the effect of his ADHD medication with his psychiatrist. (*Id.*)

### Dr. Yalkowsky

X.M. was referred by the New Jersey Division of Disability Services to Dr. Yalkowsky, a licensed psychologist, for a mental status evaluation. Dr. Yalkowsky related that, according to X.M.'s father, X.M. was getting into fights with other children and his siblings and struggling to get along with his peers; he preferred to isolate and play by himself. The father also reported significant adaptive delays such as requiring assistance using the bathroom, dressing, or engaging in or completing tasks. (R. 372–73.) He noted that teacher reports suggested X.M. was trailing his peers in learning new skills, and that X.M. had exhibited behavioral problems both at home and at school, including tantrums

4

and hitting others, as well as sometimes staying up until 2 or 3 in the morning watching television, which disrupted his sleep. (*Id.*) He further noted that X.M. was undergoing psychiatric and pharmacological treatment. (R. 372.)

In his evaluation of X.M., Dr. Yalkowsky observed that X.M. had a flat affect, was uncomfortable, and looked away from the examiner. (*Id.*) The doctor evaluated X.M. and concluded that he was "delayed in many areas and had just begun to speak," noting that X.M. could recite numbers up to 10 but could not say the alphabet past G, and that he had weak penmanship and letter formation skills. (*Id.*) He diagnosed X.M. with ADHD, and recommended an intellectual assessment. (R. 373.) However, Dr. Yalkowsky also noted that X.M. was "consistently responsive when asked questions" and "appeared focused on the conversation and seemed to be listening attentively as his father spoke about him." (*Id.*) Dr. Yalkowsky assessed a Global Assessment of Functioning of 60, indicating only mild-to-moderate problems. (R. 374.)

Dr. Nascimento

X.M. was referred to the Newark School System Child Study Team by a speech and language specialist after an assessment revealed he may have limited expressive and receptive language skills. (R. 294.) Dr. Nascimento, Psy. D., NCSP, observed X.M. in class and determined that he was attentive and on task, and found that X.M. exhibited appropriate attention and concentration, with a full IQ score of 88. (R. 30, 294–98.) Dr. Nascimento noted, however, that X.M. received significant assistance from a teacher's aide and relied on other students for help. (R. 295.) Dr. Nascimento concluded that X.M exhibited articulation issues and had unintelligible speech, but acted appropriately, smiled frequently, and was responsive throughout the examination. (R. 32–33.) The doctor also concluded that X.M. displayed "difficulty with verbal concept formation, verbal reasoning, and . . . demonstrating his working memory skills" as well as "lower academic achievement than can be expected from the areas of strength revealed by the present evaluation." (R. 298.)

<u>Teachers and Social Worker</u>

X.M.'s kindergarten teacher, Ms. Douglas, his special education teacher, Ms. Pino, and his school social worker, Roberto Del Rios, completed teacher questionnaires regarding X.M.'s behavior in school. Ms. Douglas completed her questionnaire on May 3, 2012, (R. 191–98), Mr. Del Rios completed his on December 10, 2012 (R. 256–63), and Ms. Pino completed hers on February 21, 2014 (R. 345–52).

Ms. Douglas indicated that X.M. had very serious problems in comprehending oral instructions, vocabulary, written materials, and math problems, as well as providing organized explanations and adequate descriptions, expressing ideas in written form, learning new material, recalling previous material, and applying problem-solving skills. (R. 191–98.) She also indicated X.M. had serious problems in understanding and participating in class discussions and processing information; she noted he recognized only 14 out of 52 letters, could not read, and could only identify the numbers 0, 1, and 2, though he could rote count to 20. (*Id.*) Ms. Douglas further noted X.M. had very serious problems in paying attention when spoken to, focusing long enough to complete tasks, carrying out multi-step instructions, completing homework, completing work accurately without careless mistakes, working without becoming distracted, and working at a reasonable pace. (*Id.*) She further noted X.M. struggled with relating experiences, telling stories, using appropriate language and vocabulary, following rules, and taking turns. (*Id.*) Lastly, she noted that X.M. was difficult to understand when he spoke. (*Id.*)

Mr. Del Rios noted that X.M. had significant problems in areas of attention, concentration, retaining information, completing school assignments, and following instructions. (R. 364–65) He noted that X.M. displayed deficits in waiting his turn, playing quietly, and finishing things he started. (*Id.*) He identified X.M. as exhibiting very serious problems in comprehending written materials, math problems, expressing ideas in written form, and applying problem-solving skills, as well as having serious problems

6

understanding vocabulary, explaining himself, learning new material, recalling previous material, and participating in class discussion. (R. 256–63.) He further stated that X.M. needed constant help acquiring new information and had very serious problems completing work accurately, focusing long enough to finish assignments, carrying out multi-step instructions, organizing his own things or school materials, and working at a reasonable pace. (*Id.*)

Ms. Pino reported that X.M. required a personal aide to redirect him when he went off task, ensure he followed rules, and assist him with academic tasks when he became frustrated. (R. 345–52.) She noted that X.M. had deficits in acquiring and using information, attending and completing tasks, and interacting and relating with others. She also reported that he rushed through tasks, was often restless and fidgety, and required constant redirection. (*Id.*)

<u>School Consultant Examinations</u>

Ms. Denise Gordon, a learning disabilities teaching consultant connected with the Newark School System, examined X.M. in response to academic concerns noted by X.M.'s speech and language specialist. (R. 278.) Ms. Gordon concluded that X.M. performed below grade level and had unintelligible speech, and during the assessment scored him in the extremely-low-to-low range in academic skills, academic applications, oral language, oral expression, oral language development and lexical knowledge, and linguistic complexity. (R. 278–99.) X.M. also scored average in math. (R. 282.) He was observed to be restless and fidgety during his examination. (R. 280.) Ms. Gordon observed that X.M. failed to complete tasks in the classroom but concluded that he was prompt and careful when responding to testing items, though she noted that he was "restless" and "fidgety" as well. (R. 280.)

Additionally, Mr. Jamil Huff evaluated X.M. on December 18, 2012. (R. 288–93.) Mr. Huff appears not to have interviewed or observed X.M., and used no formal evaluation tools. Rather, he spoke with an unnamed speech and language specialist and X.M.'s mother, and relayed what they reported. (R. 289–90.) He determined that X.M. was functioning below grade level, had trouble copying information from the board, and had unintelligible speech. (*Id.*)

He also concluded X.M. had limited alertness, concentration, and impulsivity, as well as completed his work inconsistently and was disorganized. (*Id.*)

### 2013 IEP

Ms. Gordon and Dr. Nascimento's examinations resulted in an IEP for X.M. which was initially implemented in March 2013. (R. 300–10.) That IEP provided X.M. special education services including speech and language services, as well as pull out resource programs for math and reading. (R. 306–10.) On July 1, 2013, his IEP indicated that he would be placed in a full-time instructional special education setting beginning September 9, 2013, for all academic areas, with continued speech and language services and a personal aide. (R. 313–346.) However, that July 2013 IEP noted that X.M.'s learning and language disability was "mild/moderate." (R. 316.)

### State Agency Expert Psychologists

In an initial disability determination by the New Jersey Division of Disability Services ("DDS"), X.M. was examined by two state expert psychologists, Michael D'Adamo, Ph.D, and Joseph Bencivenne, Ph.D. (R. 75, 84.) Dr. D'Adamo determined that X.M. had a less-than-marked limitation in "acquiring and using information," and "attending to and completing tasks," and had no limitation in "interacting and relating with others," "moving about and manipulation of objects," "caring for himself," and "health and physical well-being." (R. 71–72.) He concluded that X.M. was functioning in the borderline deficient range of intelligence, resulting in achievement approximately 2 grade levels below his grade, and that X.M. was responding favorably to treatment in the "attending to and completing tasks" domain. (*Id.* at 71.) Dr. Bencivenne evaluated X.M. on reconsideration of Dr. D'Adamo's opinion, and concluded that X.M. had a favorable response to treatment and was functioning adequately in the classroom, but remained hindered in his academic progress as a result of the past effects of his ADHD, and so concurred in Dr. D'Adamo's opinion. (R. 84.)

Jacqueline Perdomo

X.M.'s mother testified at the hearing before ALJ Dunn. She stated that X.M. was easily side-tracked, had poor concentration, and struggled to retain new information. (R. 48–52.) She explained that he has difficulty reading, limited knowledge of the alphabet, and was below grade level in math; he would forget colors, numbers and writing, and could only count up to 15, skipping numbers. (R. 51, 61–62.) She further explained that X.M. would cry, throw temper tantrums, become easily frustrated despite assistance, and struggle with sleeping approximately four nights a week. (R. 51–57.) She noted that he struggled to take care of his personal needs, required assistance washing after using the toilet, would wet the bed, ate bar soap, could not dress independently, did not know right from left, and needed to be told step-by-step how to complete tasks such as putting his toys away. (R.58–62.) Ms. Perdomo explained that at school, X.M. had a one-on-one aide and was in a self-contained class with in-class support. (R. 48–52.)

## II.   DECISION FOR REVIEW

### A. The Three-Step Process and this Court's Standard of Review

The Social Security Administration uses a three-step evaluation process to determine whether a child is entitled to benefits. 20 C.F.R. § 416.924(a). In the first step, the Commissioner determines whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. §§ 416.924(b), 416.971–416.976. If not, the Commissioner moves to step two to determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 416.924(c). If the claimant has a severe impairment, the Commissioner inquires in step three as to whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments, or functionally equals such listings. 20 C.F.R. 416.924(d), 416.925, 416.926, 416.926a; 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A–B. In doing so, the Commissioner must consider the combined effect of all medically determinable impairments, even those that are not severe. 20 C.F.R. § 416.923,

416.924a(b)(4), 416.926a(a) and (c). The ALJ uses the "whole child" approach to determine if an impairment is functionally equivalent to a listing. SSR 09-1p. The ALJ considers the child's functioning without considering the domains or individual impairments, identifying which of the child's activities are limited, and then identifying which domains are involved in those activities. *Id.*[4]

For the purpose of this appeal, the Court's review of legal issues is plenary. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Factual findings are reviewed "only to determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When substantial evidence exists to support the ALJ's factual findings, this Court must abide by the ALJ's determinations. *See id.* (citing 42 U.S.C. § 405(g)).

## B. The ALJ's Decision

The ALJ applied the three-step sequential framework.

At step one, the ALJ found that X.M, a young child, had not performed substantial gainful activity since the application date. (R. 24.)

---

[4]     The standards for children are thus different than those for adults. In both contexts, the Commissioner must determine if the claimant has engaged in substantial gainful activity, and whether the alleged impairment is severe. 20 C.F.R. §§ 416.920(a)(4)(i–ii), 416.924(b–c). The tests diverge at the third step and thereafter. An adult must show his or her impairment meets a listed impairment, or show that the impairment prevents the performance of his or her past work and he or she cannot now engage in substantial gainful activity. *Burton v. Berryhill*, 267 F. Supp. 3d 520, 524 (E.D. Pa. 2017) (citing *Sullivan v. Zelbey*, 493 U.S. 521, 534–37 (1990)); *see also* 20 C.F.R. §§ 416.920(a)(4)(iv–v), 416.920(d). Unlike children, adults may not qualify for benefits by demonstrating that their impairment is "functionally equivalent" to a listing. That relaxation suggests a greater focus on the condition itself, and a lesser focus on gainful employment. The guidelines for children contain no subsequent steps at which, despite not qualifying for a listing, the applicant may nevertheless establish a disability by demonstrating that he or she is unfit to work. *Burton, supra.*

At step two, the ALJ found that X.M. had the severe impairments of ADHD, asthma, learning disability, and hypertension. (R. 25.)

At step three, the first ALJ found that X.M.'s impairments did not meet any listings. (R. 25.) The ALJ rejected X.M.'s claims of meeting listings based on his asthma, hypertension, and learning disability, rulings which X.M. does not contest on appeal. (R. 25.)

As for X.M.'s ADHD, the ALJ concluded as follows:

> [T]he record does not document marked inattention; marked impulsiveness; and marked hyperactivity, with at least 2 of the following: marked impairment in age appropriate cognitive/communicative function; marked impairment in age appropriate social functioning; marked impairment in age appropriate personal functioning; and marked difficulties maintaining concentration, persistence, or pace. Therefore, I find that the claimant does not meet or medically equal Listing 112.11.

(R. 26.)

The ALJ then considered whether X.M.'s impairments were functionally equivalent to the listings. The ALJ found that X.M. lacked an impairment functionally equal to the severity of Listing 112.11. In a detailed section of the opinion, the ALJ carefully considered all six functional domains, including (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. (R. 27–37.) ALJ Dunn gave great weight to the DDS psychologists, who found less-than-marked or no limitation in all six domains. (R. 28, 71, 84.) She nevertheless disagreed with those psychologists on "acquiring and using information," concluding based on the questionnaires submitted by Ms. Douglas, Mr. Del Rios, and Ms. Pino that X.M. had a marked, rather than less-than-marked, limitation in that domain. (R. 28–29.) ALJ Dunn came to that conclusion based on the fact that all three educational professionals rated the vast majority of items in that domain as very serious or serious problems, as well as the fact that X.M. had a personal aide assigned to the classroom to assist him with academics. (*Id.*)

As for the other domains, however, ALJ Dunn found that X.M. had less-than-marked or no limitation. While X.M.'s teachers had noted that X.M. had serious or very serious problems in many areas of "attending and completing tasks," they also rated other items relating to that domain as being only "slight" or "no problem[(s)]," (R. 30.), such as carrying out single step instructions, completing homework and class assignments, and waiting to take turns. (*Id.*) ALJ Dunn discounted Dr. Gomez-Rivera's statement that X.M. could not focus at school because it was contradicted by Dr. Nascimento's conclusion that X.M. was attentive and on task in the classroom, and Dr. Nascimento, unlike Dr. Gomez-Rivera, actually evaluated X.M. in class. (*Id.*) The judge furthermore gave great weight to the state expert psychologists, who found X.M. had less-than-marked limitation in that domain. (*Id.*) Similarly, in the domain of "interacting and relating to others," the ALJ noted that X.M.'s father reported anger, aggression with siblings and peers, and fights and temper tantrums at school, but also noted that Ms. Douglas, Mr. Del Rios, and Ms. Pino gave somewhat inconsistent responses in their questionnaires on this domain, finding serious problems in certain aspects but no or slight problems in "playing cooperatively with other children; making/keeping friends; seeking attention appropriately" and many other areas. (R. 32.) The ALJ also weighed Ms. Perdomo's statements that X.M. is affectionate to his parents, but not other children and has a limited number of friends. (R. 32.) She discussed X.M.'s difficulties with speech but noted that only some of the medical professionals and educators mentioned it at all, and that she spoke with X.M. at the hearing and X.M. was able to make himself understood. (R. 32–33.) The ALJ found no limitation in moving about and less-than-marked limitation and health and well-being, (R. 34–37), which are not disputed in this appeal.

Plaintiff appeals from the ALJ's decision, claiming that X.M., who is currently receiving benefits, was also disabled in the earlier period, March 31, 2012 through July 11, 2014, and should be awarded benefits for that period.

## III.    DISCUSSION

X.M. asserts that the ALJ: (1) improperly failed to find that X.M. met Listing 112.11; and (2) failed to find that X.M. was functionally equivalent to Listing 112.11. X.M.'s arguments are grounded in her assertion that the ALJ gave inadequate consideration to the opinions of Drs. Gomez-Rivera, Yalkowski, Okoh, and Nascimento, as well as Ms. Douglas, Ms. Pino, Mr. Del Rios, Ms. Huff, Ms. Gordon, and X.M.'s mother.[5]

### A. Whether X.M. Met Listing 112.11

Plaintiff asserts that X.M. meets or equals the criteria for Listing 112.11 ("Neurodevelopmental disorders for children age 3 to attainment of age 18"). (Pl.'s Br. at 14–17.) "For a claimant to show his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Jones*, 364 F.3d at 504 (citation omitted). The claimant has the burden to "provide sufficient medical evidence" to show that he satisfies a listing. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 n.2 (3d Cir. 2000).

At the time of X.M.'s application for benefits, Listing 112.11 required as follows:[6]

A.  Medically documented findings of all three of the following:

1. Marked inattention; and
2. Marked impulsiveness; and
3. Marked hyperactivity; and

---

[5]    X.M. argues separately that the ALJ's decision should be reversed because ALJ Dunn failed to properly consider all of these sources. Such a failure, absent any proof that the error was *harmful*—that is, resulted in a denial of an otherwise meritorious claim—is insufficient to require reversal or remand. *Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009). I will thus consider that argument in the context of particular findings which, if the ALJ erred, would have resulted in a finding of disability in X.M.'s favor.

[6]    Though X.M. notes that the requirements of Listing 112.11 have changed since the time of his application, (Pl.'s Br. 20–21), new listing requirements are inapplicable to decisions based on applications arising before the changes were enacted. *Brando v. Colvin*, 2017 WL 2364194 at *21 n.4 (D.N.J. May 31, 2017); *see also Sponheimer v. Comm'r of Soc. Sec.*, 2016 WL 4743630 at *6 (D.N.J. Sept. 8, 2016).

B. . . . . for children (age 3 to attainment of age 18), resulting in at
least two of the appropriate age-group criteria in paragraph B2
of 112.02.

Listing 112.02, B2, in turn, set forth the following criteria:

a. Marked impairment in age-appropriate
cognitive/communicative function, documented by medical
findings (including consideration of historical and other
information from parents or other individuals who have
knowledge of the child, when such information is needed and
available) and including, if necessary, the results of appropriate
standardized psychological tests . . . .

b. Marked impairment in age-appropriate social functioning,
documented by history and medical findings  . . . . ; or

c. Marked impairment in age-appropriate personal functioning,
documented by history and medical findings . . . . ; or

d. Marked difficulties in maintaining concentration, persistence, or
pace.

For an impairment to be "marked," it must interfere seriously with the child's
ability to independently initiate, sustain, or complete activities. 20 C.F.R.
416.926a(e)(2). The ALJ found X.M. had a marked limitation in acquiring and
using information, which is similar to 112.02 B2(a) (age-appropriate
cognitive/communicative function), but found no marked limitations which
would allow X.M. to meet the requirements of 112.11 A. (R. 28–29.)

X.M. objects that the evidence showed that he had marked limitations in
"cognitive/communicative functioning," "concentration, persistence or pace,"
and "personal functioning." He argues that the evidence submitted by his
teachers, parents, and doctors indicated that he had very serious problems in
each of those areas, that his 2013 IEP indicated that he was functioning below
grade level with delayed speech, that he was getting into fights at school,
having tantrums at home, and required supervision at home and in school. (R.
17–21.) He further argues that ALJ Dunn failed to give proper due to Dr.
Gomez-Rivera's ADHD diagnosis as a treating physician, which he asserts

14

establishes marked inattention, impulsiveness, and hyperactivity, and asserts that the ALJ ignored Dr. Okoh and Dr. Yalkowsky. (R. 14–17.)

X.M. is correct that there is substantial evidence in opposition to the ALJ's decision that he fails to meet Listing 112.11. The standard of review here, however, is different: I must affirm if there is substantial evidence in favor of the ALJ's decision. *Sykes*, 228 F.3d at 262. The ALJ gave great weight to the DDS expert psychologists, as she was entitled to do, 20 C.F.R. § 416.927(e)(2)(i); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361–62 (3d Cir. 2011) ("State agent opinions merit significant consideration"); *Suarez v. Comm'r of Soc. Sec.*, 2018 WL 2059553 at *8 (D.N.J. May 3, 2018) (state agency expert "can override the treating sources' opinions provided they are supported by substantial evidence in the record"), who both reviewed the evidence in support of X.M.'s claim to Listing 112.11 and found X.M. had no marked limitations whatsoever. (R. 71, 84).

The DDS psychologists' analysis was focused on the factors relevant to a finding that X.M. had the functional equivalent of a listed disability. Their analysis plainly bears on the direct requirements of Listing 112.11 as well: They found X.M. lacked any marked limitations at all, and only less-than-marked limitations in "acquiring and using information" and "attending and completing tasks," domains which are akin to 112.11 B2(a) and B2(d). (*Id.*) They found no limitation at all in the categories similar to "age-appropriate social functioning" and "age-appropriate personal functioning" prongs of 112.02 B2. (*Id.* (no limitation in "interacting and relating with others," "caring for oneself," and "health and physical well-being.")) Their findings were also plainly relevant to the Listing 112.11 requirements that X.M. exhibit marked impulsivity, hyperactivity, and inattention, as the DDS experts concluded that X.M. had only a less-than-marked limitation in "attending to and completing tasks." (*Id.*)

Furthermore, there was other evidence in the record suggesting that X.M. did not have marked inattention, hyperactivity and impulsiveness; in

particular, Drs. Yalkowsky and Nascimento, who met with X.M. and, in Dr. Nascimento's case, observed him in the classroom, noted that he was responsive, focused, attentive, exhibited appropriate concentration and attention, and exerted significant effort on tasks. (R. 296, 373–74.)[7] The ALJ was entitled to credit this information in concluding that X.M. had failed to prove the requirements of Listing 112.11.

Finally, X.M. received a full-scale IQ score of 88, and ALJs are directed to consider such "appropriate standardized psychological tests" in evaluating limitations in cognitive/communicative function. 20 C.F.R. Part 405, Subpt. P Appx. 1, § 112.02(B)(2)(a). A score of 88 is only low-average, and weighs against a finding of marked disability in cognitive/communicative function.

All of this evidence, together, provides the "substantial evidence" which is required to support the ALJ's decision. *Sykes*, 228 F.3d at 262. I thus conclude that there was substantial evidence in support of the ALJ's conclusion that X.M. did not meet the requirements of Listing 112.11.

Of course, the ALJ would not have been permitted to simply *disregard* the evidence in support of X.M.'s position. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). Here, however, the ALJ did take that evidence into account and rejected it based on substantial grounds, which were articulated in her decision.[8] She considered Dr. Gomez-Rivera's diagnosis of ADHD and his

---

[7]     X.M. argues that these evaluations should be given less weight than Doctor Gomez-Rivera's evaluation and the educators' evaluations, because "an ADHD child often responds well in a highly structured setting." (Reply at 2.) Fair enough, but that argument was properly directed to the ALJ; it is not my role on review to decide which evidence is more persuasive, but only to decide whether the ALJ appropriately considered the evidence and there was substantial evidence in support of the ALJ's decision.

[8]     While the ALJ responded to this countervailing evidence in the section regarding X.M.'s functional equivalence rather than his direct entitlement to the 112.11 listing. Her reasoning, however, is clear and if anything applicable *a fortiori* to the "meets or equals" analysis.  The record and bases for the ALJ's decision are sufficiently developed to permit meaningful review. *Santiago v. Comm'r of Soc. Sec.*, 273 Fed. App'x 211, 213–14 (3d Cir. 2008); *Jones v. Barnhart*, 364 F.3d 501, 504–05 (3d Cir. 2004) ("the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that Jones did not meet the

treatment records, but noted that they were inconsistent with other evidence in the record; for instance, Dr. Gomez-Rivera noted in his records, presumably based the statements of X.M. or his parents, that X.M. could not focus at school on January 3, 2013, but Dr. Nascimento's January 30, 2013 psychological assessment in which he actually observed X.M. in class noted that X.M. was "attentive and on task" both with and without a teaching aide present. (R. 30.) *See also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (while "[a]n ALJ should give treating physicians' reports great weight" such an opinion may nevertheless "be afforded more or less weight" depending on the sufficiency of the supporting explanation) (internal quotation marks and citations omitted); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (ALJ "may choose whom to credit" but "must consider all the evidence and give some reason for discounting the evidence she rejects.") (internal quotation marks and citations omitted). The ALJ further noted that Dr. Gomez-Rivera had acknowledged in January of 2014 that X.M. displayed average concentration, a clear improvement from his prior evaluation. (*Id.*)

X.M. asserts that the ALJ improperly discounted Dr. Okoh's opinion, but there is no indication in the record that Dr. Okoh performed any independent assessment of X.M.'s mental status. Dr. Okoh only noted that Dr. Gomez-Rivera had diagnosed X.M. with ADHD and recounted the parents' accounts of X.M. being hyperactive. (R. 369–70, 386–96.) The ALJ thus had a proper basis for giving lesser weight to Dr. Okoh's opinion. Similarly, Dr. Yalkowsky recounted the parents' accounts of X.M.'s behavior, but did not himself observe any hyperactivity, impulsivity, or inability to concentrate. (R. 373.) Dr. Yalkowsky thus assessed a GAF score of 60, which he explicitly noted indicated only "mild-to-moderate" problems. (R. 374.)

As for the submissions by X.M.'s teachers and social workers, in some areas the ALJ validly concluded that she would assign them less weight than

---

requirements for any listing."). I thus reject X.M.'s argument that the ALJ failed to explain her decision regarding whether X.M. met Listing 112.11. (Reply at 6.)

the conclusions of the DDS expert psychologists. The ALJ did not, however, fail to credit such submissions; where, for example, they were nearly unanimous in stating that X.M. had serious or very serious limitations, such as in the "acquiring and using information" domain, the ALJ found a marked limitation, a *greater* limitation than was recommended by the DDS experts. (R. 28–29.) That finding, however, does not alone establish that X.M. qualified for Listing 112.11.

As for the other domains, the educators' submissions were inconsistent; some considered X.M. to have serious problems in areas where others found no problems at all. For example, while X.M.'s educators ranked many items in the "attending and completing tasks" domain as "serious" or "very serious" problems, Ms. Douglas concluded that other items in that domain such as "sustaining attention during play/sports activities" and "waiting to take turns" were only "slight problems." (R. 30.) Similarly, Mr. Del Rios determined that X.M. rushes through his work, but also concluded that X.M. had no trouble changing from one activity to another, conclusions which might weigh both for and against finding limitations in "attending and completing tasks." (*Id.*)

It is not my role to reweigh the evidence, but rather to determine whether the ALJ performed that function and had substantial evidence in support of her decision. X.M. notes correctly that there was evidence in support of a finding that he had a marked limitation in social functioning, given his frequent fights at schools, tantrums, and struggle to communicate. Reply at 7. The ALJ, however, was entitled to discount this evidence in light of the DDS experts' conclusions and the other countervailing evidence. The same is true of X.M.'s assertion that he had a marked limitation in "age-appropriate personal functioning" and "concentration, persistence, or pace." *Id.* at 7–8.

A different ALJ could have reached a different conclusion on this record. I am nevertheless convinced that substantial evidence supported this ALJ's conclusion that X.M.'s impairments did not meet the requirements of the listings. I move to the issue of whether X.M.' limitations were functionally equivalent to the listings.

## B. Whether X.M.'s Limitations Were Functionally Equivalent to Listing 112.11

If a child's impairment or combination of impairments meets, medically equals, or functionally equals the requirement of any impairment listed in 20 C.F.R. part 404, Subpart P, Appendix 1, then that child may be found disabled. 20 C.F.R. §§ 416.925, 416.926a(a). In determining whether a child's limitations are functionally equivalent to a listed impairment, the ALJ evaluates the effect of the child's impairment in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)–(vi).

If a child has an extreme limitation in one domain of functioning, or a marked limitation in two such domains, an ALJ must find that the child's impairment is functionally equivalent to a listed impairment. 20 C.F.R. § 416.926a(a). A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities," while an "extreme" limitation interferes with the same abilities, but "very" seriously. 20 C.F.R. §§ 416.926a(e)(2)(i), 416.926a(e)(3)(i).

X.M. makes two arguments in favor of functional equivalence: (1) the ALJ should have found extreme, rather than marked, limitation in the "acquiring and using information" domain, and (2) that the ALJ erred in failing to find marked limitations in "attending and completing tasks," "interacting and relating with others," and "caring for oneself." (Pl.'s Br. 21–26; Reply at 10.)

X.M.'s first argument can be rejected largely for the reasons discussed in the previous section. X.M. asserts that the ALJ was required to find that he exhibited an extreme limitation in the "acquiring and using information," citing the questionnaires submitted by Ms. Douglas, Mr. Del Rios, and Ms. Pino. But, as mentioned above, the ALJ permissibly gave weight to the opinions of the DDS psychologists, who concluded that X.M.'s limitations were less-than-marked in this domain. (R. 71, 84.) Still, the ALJ was moved by the educators' statements to the extent of finding a limitation at the "marked" (but not

19

extreme) level. Indeed, before the ALJ, plaintiff herself argued for no more than a "marked" limitation in this area. (Pl.'s Br. at 22 (admitting that X.M. had only argued in favor of "marked" limitations in the domain of "acquiring and using information" before the ALJ).) This conclusion is further buttressed by X.M. full-scale IQ score of 88, which is at the lower end of average. (R. 294–98.) Substantial evidence supported the ALJ's decision to find no more than a marked limitation.

The same is true of X.M.'s second argument that the ALJ should have found marked limitations in several domains. The ALJ gave great weight to the DDS expert psychologists' opinions, as she was entitled to do. Though many of X.M.'s educators noted X.M. has serious or very serious problems in areas related to the domain of "attending to and completing tasks," they also noted that some areas in that domain were merely "slight" or even "no" problem. I consider, for example, Mr. Del Rios's evaluation that X.M. had no problem with changing from one activity to another without being disruptive. (R. 30.) The ALJ further noted that the evidence as to whether X.M. was able to focus at school was mixed: Dr. Gomez-Rivera had concluded that X.M. was unable to pay attention in school in his January 3, 2013 report, but Dr. Nascimento's January 30, 2013 psychological assessment, based on direct observation, concluded that X.M. was focused and on task. (R. 30.) Ultimately, in light of this mixed evidentiary record, the ALJ was entitled to rely on the DDS experts' opinion and find a less-than-marked limitation. (*Id.*)

Similarly, DDS found that X.M. had no limitation in "interacting with and relating to others," (R. 71–72, 83), and the ALJ gave that determination great weight. True, X.M.'s father reported that X.M. is angry and aggressive with his siblings and has gotten into fights and tantrums at school. X.M.'s educators, however, gave mixed responses, identifying serious and very serious problems in some areas of that domain, but also "no" or "slight" problems in areas such as "making/keeping friends," "playing cooperatively with other children" and "expressing anger appropriately." (R. 32.) While some sources had concluded that X.M. struggled to communicate with others because they struggled to

understand his speech, the ALJ conversed with X.M. at the hearing and X.M. was able to make himself understood. (R. 33.) The ALJ was entitled to rely on DDS's conclusions and find that X.M. had a less-than-marked limitation in this domain.

Finally, DDS reported that X.M. had no limitation in "caring for himself," and X.M.'s teachers stated that X.M. had no or slight problems in virtually all of the items relevant to this domain, including taking care of personal hygiene, caring for physical needs, handling frustration appropriately, and using good judgment regarding personal safety and dangerous circumstances. (R. 35.) True, Ms. Perdomo had, in 2012, stated that X.M. does not zipper himself, button his clothes, tie his shoes, brush his teeth or hair, choose his clothes, or help around the house. In 2013, however, she reported that he was capable of doing many of those tasks, from which ALJ Dunn concluded that X.M. had developed age-appropriate adaptive skills. (R. 35.) The ALJ concluded that in light of Ms. Perdomo's statements, she would depart upward from DDS's conclusion that X.M. had no limitation in the domain, but only so far as to find a less-than-marked limitation. (R. 36.) There was substantial evidence in the record in support of that decision and so I must affirm.

## IV.   CONCLUSION

For the reasons set forth above, the Commissioner's decision is **AFFIRMED**.

A separate order will issue.

Dated: December 22, 2020

/s/ Kevin McNulty

_____
**Hon. Kevin McNulty**
**United States District Judge**